+IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| EMCASCO INSURANCE COMPANY, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. CIV-20-349-D |
| | ) |
| WATONGA INDUSTRIAL, LLC, | ) |
| | ) |
| Defendant. | ) |

# ORDER

Watonga Industrial, LLC submitted a claim to its insurer, EMCASCO Insurance Company ("EMC"), claiming that the roof of its large commercial building was damaged in a hailstorm. EMC investigated the claim and found evidence of long-term disrepair and preexisting damage. EMC acknowledged, however, that a hailstorm occurring during the policy period could have caused damage to the roof and it therefore issued Watonga a check for the estimated cost to repair the roof.

Several months later, claiming that it could not find a roofing contractor to perform the repairs for the amount provided, Watonga obtained an estimate to replace the roof that was significantly higher than EMC's estimate. After further investigating the claim and communicating with the public adjuster Watonga hired to represent it, EMC filed this declaratory judgment action seeking a declaration that 1) Watonga cannot recover any further benefits because the policy's two year suit limitations period expired, 2) coverage under the policy is void because Watonga misrepresented the age and condition of the roof, 3) EMC has already paid Watonga all that is owed under the policy for the covered damage,

1

and 4) there is no coverage for any other damage to the roof because it occurred prior to the inception of the policy or after it lapsed. Am. Compl. [Doc. No. 16] ¶ 22.

Watonga answered and filed a counterclaim, asserting that EMC breached the insurance contract by refusing to pay the replacement cost of the roof and acted in bad faith by making an unreasonably low settlement offer when it knew the roof required replacement. Counterclaim [Doc. No. 17] ¶¶ 39-40. Watonga further alleged that punitive damages are warranted because EMC behaved recklessly or intentionally. *Id.* at ¶ 42.

EMC now seeks summary judgment [Doc. No. 46], asserting that Watonga is not entitled to any additional sums under the policy because it failed to initiate a lawsuit within the two-year limitations period, that the bad faith claim is precluded by a legitimate coverage dispute, and that there is no evidence of reckless conduct. Watonga has responded in opposition [Doc. No. 66] and EMC has replied [Doc. No. 67].[1]

## FACTUAL BACKGROUND[2]

EMC issued a policy of insurance to Watonga for a large commercial building located in Watonga, Oklahoma. The policy period ran from March 31, 2016 to May 15,

---

[1] Several motions seeking to exclude or strike portions of proposed expert testimony are also pending [Doc. Nos. 47-49]. Resolution of these motions in advance of ruling on EMC's request for summary judgment is unnecessary because reference to the expert testimony is not material to the issues raised in the summary judgment briefing.

[2] Defendant's response brief does not comply with the local Court Rules, which require a party opposing a motion for summary judgment to respond to the movant's statement of facts "*by correspondingly numbered paragraph*" and to set out any additional facts in separate numbered paragraphs. LCvR56.1(c) (emphasis in original). Defendant's failure to comply with this rule has made it needlessly difficult for the Court to determine the precise factual statements that are disputed. In any event, the facts stated in this section include both undisputed facts stated by Defendant in its supporting brief and additional facts stated by Plaintiff in its response brief, which are undisputed by Defendant in its reply.

2017 and provided coverage for loss or damage occurring "[d]uring the policy period." Pl.'s Undisp. Mat. Facts at ¶¶ 1-4. The policy further provided that "[n]o one may bring a legal action against [EMC] under this Coverage Part unless…[t]he action is brought within 2 years after the date on which the direct physical loss or damage occurred." *Id.*

On May 15, 2017 – the last day the policy was in force – Watonga submitted a claim to EMC for hail damage to the building's roof that purportedly occurred during a storm on May 9, 2017. *Id.* at ¶ 5. That same day, EMC claims specialist James Hunt spoke with Watonga's representative and retained an independent adjuster to assist with the claim. *Id.* at ¶ 6. The independent adjuster promptly inspected the property and submitted a report to EMC. *See* Pl.'s Br., Ex. 8. The report noted that there was small tree growth in certain areas of the roof, older hail damage, and failed seams that may be allowing moisture intrusion. *Id.* The report recommended that an engineer be retained to determine if the roof damage was due to a covered loss. *Id.*

EMC then engaged a licensed professional engineer, who inspected the roof and issued a report on July 5, 2017. The report made the following observations:

- The roof of the building is made of three materials: an EDPM roof covering 162,000 square feet, a spray foam roof covering 69,000 square feet, and a thermoplastic roof membrane covering 3,560 square feet.
- The EDPM roof was adhered over a foam roof. It was in poor condition and had seam splits, openings, shrinkage, prior repairs, failed past repairs, low areas, standing water within the roof system, and blisters. Recent hail spatter was too small to cause damage and hail penetrations in a limited number of areas were older.
- The foam roof was in below average condition with recent and past repairs, uneven surfaces, blemishes, blisters caused by trapped moisture, and deterioration from wear and tear. Hail impacts to this section of the roof were older.

3

- The thermoplastic roof showed wind damage that likely occurred an extended period of time prior to the inspection, older hail damage, and openings in the covering from displacement of amateur temporary repairs.
- The interior building had numerous leaks, long term water intrusion and neglect, and widespread fungal growth.
- There was evidence of a recent hail event at the building site, but spatter marks were consistent with smaller hail not of sufficient size to significantly impact exterior surfaces.
- National Weather Service and CoreLogic Spatial Solutions reports indicated that damaging hail may have fallen in this area on four occasions in the past four years: May 8, 2016, May 26, 2015, May 31, 2013, and May 8, 2013.

Pl.'s Ex. 10. The report concluded that all three roof sections had sustained hail damage at some point and recommended repair of the EDPM roof and replacement of the foam and thermoplastic roof sections. *Id*.

Mr. Hunt, EMC's claims specialist, reviewed the engineering report and obtained a copy of weather reports that were referenced by the engineer. Pl.'s Ex. 5 at 1110. Based on the engineer's report, Mr. Hunt concluded that the foam roof and thermoplastic roof sections "needed to be addressed" and he requested that the independent adjuster obtain an estimate. *Id.* at 1111.

Pursuant to these instructions, the independent adjuster met with a commercial roofer at the building site. Pl.'s Ex. 11. According to the adjuster, the roofer recommended repairs to the foam roof and reached an agreed cost to complete the repairs. Pl.'s Undisp. Mat. Fact 10. The roofer, however, testified that he never provided any estimate for repair work, but that he could have told the independent adjuster how much repairs to the foam roof would cost per 10x10 square of roof. Def.'s Ex. 15, Depo of Hunn, 46:7-47:7; 59:22-60:14. The roofer also testified that he believed the foam roof could be repaired through a process called scarfing or scarifying, but that it would be necessary to core the roof to make

a good decision regarding whether the roof should be repaired or replaced. *Id*. at 62:9-63:24. The roofer further testified that he never provided an estimate for repair to the EPDM portion of the roof and that EMC's estimated amount for this work was unreasonably low. *Id.* at 54:12-59:21. Finally, he testified that the independent adjuster told him that the owner of the building did not want to spend a lot of money on the roof. *Id.* at 35:16-36-17.

After meeting with the roofer, the independent adjuster prepared a supplemental report that was submitted to Mr. Hunt at EMC. This report included an estimate to repair the roof based on the figures the roofer purportedly provided. Pl.'s Ex. 11. The report also indicated that the estimate included the installation of vents because there was moisture that may have saturated the foam. *Id.*

After receiving the independent adjuster's estimate, Mr. Hunt entered a claim note stating that there were storms in May 2015 and May 2016 in the area and "while it could be argued that the damage occurred before the insured bought [the building], the foam roof and the EDPM could have easily been damaged in either of the aforementioned storms." Pl.'s Ex. 5 at 1111. He then noted that EMC was "paying for these roof areas as specified in the engineer report" but that "per the engineer, none of the interior damage is due to current wind or hail events." *Id.* Mr. Hunt also changed the date of loss from May 9, 2017 to May 8, 2016 based on weather reports indicating that this date was "the last measurable hail at the insured location." *Id.* at 1113.

EMC then ordered a title search on the property, which revealed an unreleased mortgage. The claim notes reflect that the independent adjuster reviewed the estimate with

5

Watonga, that Watonga did not agree to the estimate presented, and that Watonga was working on getting a mortgage release filed so that the check could be made out solely to it. *Id.* at 1115-1116. Several weeks later, on November 8, 2017, having still not received the mortgage release from Watonga, EMC issued a check to Watonga and the mortgagor for the amount reflected in the estimate, less depreciation and deductible. *Id.*; Pl.'s Ex. 13. The letter accompanying the check advised Watonga that "[c]ashing this check does not hinder your ability to further negotiate this claim." *Id.*

Watonga did not immediately cash the check, apparently because the mortgagor was included. Pl.'s Ex. 5 at 1119-1121. Eventually, Watonga provided the release of mortgage to EMC and it reissued the check on June 28, 2018, but Watonga still did not cash the check. The claim notes reflect that EMC contacted Watonga's owner at least twice over the next several months, inquired about whether he intended to cash the check, and advised him that cashing the check would not hinder his ability to negotiate the claim. *Id.* at 1125-1127. On December 8, 2018, Watonga advised EMC that it could not find a roofer to perform the repairs for the estimated amount. Pl.'s Ex. 14. EMC responded by instructing Watonga to forward an estimate from a roofing contractor and assuring Watonga that cashing the check would not hinder the ability to negotiate the claim. *Id.*

The check was eventually cashed and, in February 2019, Watonga submitted its own estimate for EMC's review. *Id.* at 1129. Watonga's estimate included a replacement of the roof, rather than a repair, and was significantly higher than EMC's estimate. Pl.'s Ex. 15.

By this point, nearly two years had passed since Watonga originally reported the claim and the policy term had expired. Consequently, EMC sent its engineer back to the

6

building site to determine whether any new damage had occurred since the original inspection. Pl.'s Ex. 15. The engineer concluded that the only new damage was wind damage to a portion of the EPDM roof in a previously compromised location and that, unlike in his first report, the EPDM roof may now need to be fully replaced. Pl.'s Ex. 16. After reviewing this report, Mr. Hunt entered a claim note indicating that the original estimate was prepared by the independent adjuster, that there "never was a [sic] estimate with a roofer guaranteeing they would do the roof work for the IA's estimate," and that "[r]eview of both engineer's report indicates moisture in roof system would have made this fact unlikely." Pl.'s Ex. 5 at 1130.

EMC subsequently opened a new claim for the wind damage and determined that it occurred outside of the policy period. On April 11, 2019, EMC sent Watonga a letter indicating that the original engineer report found only preexisting damage, but that, based on weather reports showing hail and the fact that the inspection occurred thirteen months after the date of loss, EMC "gave the benefit of the doubt that some damage may have occurred during the policy period." Pl.'s Ex. 18. This letter also indicated that the engineer report called for replacement of the foam and thermoplastic portions of the roof and claimed that the amount issued to Watonga was based on an agreed cost from the roofer. *Id.* Last, the letter indicated that the engineer's reinspection found new wind damage occurring outside the policy period, and that a claim should be made with the insurer that had the active policy period during that time. Depending on the date of loss used – either

May 9, 2017 (the date reported by Watonga)[3] or May 8, 2016 (the date EMC determined), this letter was either sent after or just before the expiration of the policy's two-year suit limitations provision.

On July 25, 2019, a public adjuster hired by Watonga emailed Mr. Hunt to advise him that it intended to engage its own engineer to inspect the building and provide a comprehensive estimate. Pl.'s Ex. 3. Mr. Hunt acknowledge receipt of the email that same day but made no mention of the policy's limitations provision. *Id.* The public adjuster emailed Mr. Hunt again on October 1, 2019 to let him know that the engineer report would arrive in the near future. *Id.* The report was sent to EMC on February 14, 2020 and an estimate for a full roof replacement that far exceeded EMC's estimate followed shortly thereafter. Pl.'s Ex. 19; Def.'s Ex. 22. In a follow up email, EMC advised the public adjuster that it was continuing to look at the information and would be in touch soon. Def.'s Ex. 25. On March 20, 2020, EMC again told the public adjuster that it was continuing to review the claim and may consider another inspection at some point, but not at that time. Def.'s Ex. 26. Less than one month later, EMC initiated this action seeking a declaration that the limitations provision in the policy precluded any further recovery by Watonga.

## STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R.

---

[3] Watonga also claims that the damage could have been caused by a storm that occurred on April 29, 2017 and asserts that EMC intentionally concealed evidence of this storm. But the weather report they rely on in making this claim shows only that flooding, not wind or hail, occurred in Watonga on that date.

8

Civ P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable juror could return a verdict for either party. *Id*. All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id*.

## DISCUSSION

### I. Suit Limitations Provision

The policy EMC issued to Watonga provides that no one may bring a legal action against EMC unless the action is brought within two years after the date on which the direct physical loss or damage occurred.[4] Relying on this provision, EMC seeks a declaration that Watonga cannot recover under the policy because it did not assert any legal action within two years of the date of loss.[5] Watonga reported its date of loss as May 9, 2017 and did not file any legal action seeking to recover additional sums under the policy until May 13, 2020, when it filed its counterclaim for breach of contract and bad faith. Watonga acknowledges that its counterclaim was filed after the expiration of the policy's limitations period, but argues that the EMC should be equitably estopped from relying on this provision because it repeatedly assured Watonga that it was covering the claim.[6]

---

[4] Contractual limitations provisions such as this are permissible under Oklahoma law. *See* Okla. Stat. Ann. tit. 36, § 3617.

[5] EMC's Amended Complaint asserts that it is entitled to a declaratory judgment for several reasons, but it relies only on the two-year limitations provision in seeking summary judgment.

[6] Watonga also argues that its counterclaim, even though untimely, is revived by Okla. Stat. tit. 12, § 2013(C). This statute provides that "[w]here a counterclaim and the claim of the opposing party arise out of the same transaction or occurrence, the counterclaim shall not

There is support for this argument in Oklahoma law. In *Prudential Fire Ins. Co. v. Trave-Taylor Co.*, 152 P.2d 273, 275 (Okla. 1944), the Oklahoma Supreme Court explained that contractual limitations provisions are "for the benefit of the insurer" and "will be deemed to have been waived where it would be inequitable to permit it to be plead." The court further explained that where waiver of a limitations provision "is properly plead and there is evidence to support the plea so made it becomes a question of fact for the jury." *Id.* Applying these rules, the court held that the insurer's demurrer at trial was properly denied where "the evidence was sufficient to support the inference that the defendant intended by its conduct to admit liability to the extent of the damage which had been done to the plaintiff's property…and that thereby the defendant waived the limitation provision when it did not deny liability within time to enable the plaintiff to institute the action within the limitation provision contained in the policy." *Id.*

Relying on *Prudential*, the Oklahoma Supreme Court found in *Agric. Ins. Co. of Watertown, N. Y. v. Iglehart*, 386 P.2d 145, 146 (Okla. 1963), that an insurer waived a limitations provision when it admitted some liability for the claim but failed to promptly deny liability for the remainder of the claim:

> [i]n such a situation where defendant admitted liability to plaintiff, but never made payment to him on his claim, and there were intermittent negotiations for settlement of the claim, the defendant thereby waived the limitation

---

be barred by a statute of limitation notwithstanding that it was barred at the time the petition was filed, and the counterclaimant shall not be precluded from recovering an affirmative judgment." However, the plain language of this statute indicates that it applies to a statute of limitations and Watonga has provided no authority suggesting that it should be interpreted to apply to a contractual limitations provision.

10

> provision of the policy. If defendant had intended to rely on the limitation provision, it should have paid plaintiff what it considered to be the reasonable value of plaintiff's loss and denied liability for anything in excess of that. If that had been done within time to allow plaintiff to commence his action for such excess claim within the limitation period of the policy, then defendant could rely on the bar of limitations.

Similarly, in *Oklahoma Farm Bureau Mut. Ins. Co. v. Lay*, 398 P.2d 506, 508 (Okla. 1965), the Oklahoma Supreme Court found that where an insurer repeatedly told the insured it would settle his claim and told him to obtain a repair estimate, the insured "may have been lulled by [the insurer's] conduct into delaying the commencement of this action" and the issue of waiver was therefore properly submitted for the jury's resolution.

Here, there is evidence that Watonga should have known that EMC did not intend to provide further payment on the claim by April 11, 2019, when it sent a letter setting out its belief that new damage to the building occurred outside of the policy period and that the original claim remains open for the payment of recoverable depreciation. Using the May 9, 2017 date of loss Watonga provided when it first submitted the claim, this letter was issued approximately one month before the two-year limitations period expired, which could have provided Watonga with sufficient time to commence its action. Further, much of the delay in resolving this claim could be attributed to Watonga's failure to promptly provide the mortgage release or obtain its own repair estimates.

However, there is also evidence from which a reasonable juror could reach the opposite conclusion. EMC initially accepted liability for damage to the roof caused by an event that it determined occurred on May 8, 2016 and, when Watonga failed to promptly cash the check for the estimate of the value of the claim, EMC repeatedly assured Watonga

11

that cashing the check would not hinder its ability to further negotiate the claim. Assuming that the date of loss is the May 8, 2016 date used by EMC when processing the claim, these assurances and the April 11, 2019 letter[7] where EMC purportedly denied liability for any additional benefits would have occurred more than two years after the date of loss. Additionally, when communicating with Watonga's public adjuster in late 2019 and 2020, EMC never indicated that it was denying the remainder of Watonga's claim or that it believed the limitations period had expired, but merely stated that it was continuing to review the claim. Given this conduct, a reasonable juror could infer that EMC intended to waive the limitations provision or otherwise lulled Watonga into delaying the commencement of its actions.

Accordingly, the Court finds that EMC's conduct with respect to the limitations provision is reasonably subject to different conclusions and must therefore be resolved by

---

[7] Watonga argues that the letter violated the notice requirement codified in Oklahoma's Unfair Claims Practice Act. This act provides that

> Insurers shall not continue or delay negotiations for settlement of a claim directly with a claimant who is neither an attorney nor represented by an attorney, for a length of time which causes the claimant's rights to be affected by a statute of limitations, or a policy or contract time limit, without giving the claimant written notice that the time limit is expiring and may affect the claimant's rights. Such notice shall be given to first party claimants thirty (30) days, and to third party claimants sixty (60) days, before the date on which such time limit may expire.

Okla. Stat. Ann. tit. 36, § 1250(C). Although the UCPA does not provide a private cause of action, Watonga suggests that EMC's failure to comply with this requirement supports its argument for tolling the limitations period. EMC counters that the provision does not apply because it was Watonga, not the insurer, who was continuing or delaying negotiations of the claim. It is unnecessary to resolve this particular issue because there is other evidence suggesting that EMC waived enforcement of the limitations provision.

the trier of fact. Defendant's motion for summary judgment seeking a declaration that the policy's two-year suit limitations provision prevents Watonga from recovering under the contract or pursuing a breach of contract theory is therefore denied.

## II. Bad Faith Claim

Watonga contends that EMC breached its duty of good faith and fair dealing by conducting an unreasonable investigation of the claim and making an unreasonably low settlement offer. EMC argues that it is entitled to summary judgment on this claim because the undisputed facts establish that a legitimate coverage dispute exists.

Under Oklahoma law, an insurer has an implied duty to deal fairly and act in good faith toward its insured, and the violation of that duty gives rise to an action in tort. *Christian v. American Home Assurance Co.*, 577 P.2d 899, 904 (Okla. 1977). To succeed on a claim for the violation of the duty of good faith and fair dealing, a plaintiff must prove four elements: "(1) claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury." *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 724 (Okla. 2009). The "critical question" in this analysis "is whether the insurer had a good faith belief, at the time its performance was requested, that it had a justifiable reason for withholding [or delaying] payment under the policy." *Id.* at 725 (internal quotation omitted) (alteration in original). *See also Badillo v. Mid Century Ins. Co.,* 121 P.3d 1080, 1093–94 (Okla. 2005) ("A central issue in any analysis to determine whether breach has occurred is gauging whether the insurer had a good faith belief in some

justifiable reason for the actions it took or omitted to take that are claimed violative of the duty of good faith and fair dealing."). Thus, "[i]f there is a legitimate dispute concerning coverage or no conclusive precedential legal authority requiring coverage, withholding or delaying payment is not unreasonable or in bad faith." *Ball*, 221 P.3d at 725.

Under this standard, an insurer does not act in bad faith by disagreeing with an insured regarding coverage or the amount of loss or resorting to a judicial forum. *Christian*, 577 P.2d at 905. Nor does an insurer act in bad faith when it engages in conduct that is merely negligent. *Badillo,* 121 P.3d at 1094. Importantly, however, under Oklahoma law, "if there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case." *McCorkle v. Great Atl. Ins. Co.*, 637 P.2d 583, 587 (Okla. 1981).

Upon consideration of the summary judgment record, the Court finds that a genuine dispute of material facts precludes summary judgment on the issue of EMC's bad faith conduct. Viewing the facts in the light most favorable to Watonga, there is evidence from which a reasonable juror could conclude that EMC determined that at least some of the damage to the roof was a covered loss but then issued policy benefits that it knew would be inadequate to fix the damage. For example, the engineering report EMC obtained recommended replacement, rather than repair, of sections of the roof and a note in the claim file indicates that the adjuster understood, based on the engineering report, that moisture in the roof system would have made repair of the roof unlikely. Additionally, although EMC represents that it had an agreed cost with a roofer to repair the roof, the claim notes indicate

14

that there was not an estimate from a roofer guaranteeing they would do the work for that amount. Further, the roofer EMC relied on testified that although he thought the roof could be repaired, there was no way to tell for sure without coring the roof and that EMC's estimate to repair the EDPM section of the roof was unreasonably low. These facts undermine EMC's argument that it "had a good faith belief in some justifiable reason" for offering benefits based on the cost to repair the roof, rather than replace it. *Badillo*, 121 P.3d at 1094. And, unlike in a situation where the insured and insurer simply disagree about the cause or extent of the damage, these facts suggest that EMC's own personnel were aware that the estimate was insufficient to cover the damage. *See Newport v. USAA,* 11 P.3d 190, 197 (Okla. 2000) (holding that the duty of good faith "prevents an insurer from offering less than what its own investigation reveals to be the claim's value" and that the insured's bad faith claim was appropriately resolved by jury where the insurer "promised to make [certain] coverage available, made a small advance towards that end, and then refused to make further payment on the claim outside a settlement far below the dollar value placed on the claim based on its own investigation.").

Because at least some of the material facts are disputed and the reasonableness of EMC's conduct in limiting its offer to repair benefits is subject to different inferences, summary judgment with respect to Watonga's bad faith claim is not appropriate.

### III. Punitive Damages

EMC also seeks summary judgment as to Watonga's claim for punitive damages. For punitive damages to be allowed under Oklahoma law, "there must be evidence, at a minimum, of reckless disregard toward another's rights from which malice and evil intent

may be inferred." *Badillo*, 121 P.3d at 1106 (emphasis in original). The basis for Watonga's punitive damages request is their assertion that EMC knowingly and intentionally refused to pay for a full roof replacement even though it knew a replacement was required. Viewing the record in the light most favorable to Watonga, the Court concludes that the genuine disputes of material facts related to Watonga's bad faith claim also preclude a summary adjudication of the issue of punitive damages. Watonga has presented evidence that is sufficient, although minimally so, to support an inference of reckless disregard by EMC.

## CONCLUSION

As explained above, the Court finds that genuine disputes of material facts preclude summary judgment on the issues raised. IT IS THEREFORE ORDERED that Plaintiff EMCASCO Insurance Company's Motion for Summary Judgment [Doc. No. 46] is DENIED.

_____
TIMOTHY D. DeGIUSTI
Chief United States District Judge